**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| **HENRY FOSTER, III, Individually and as Administrator of the Estate of HENRY FOSTER, IV, Deceased,**<br><br>Plaintiff,<br><br>v.<br><br>**KENTUCKY STATE POLICE DEPARTMENT, COREY CHARLES, NICHOLAS HOWELL, RICKY NEWSOM; JEREMY GILES, and BRYAN AUSTIN,**<br><br>Defendants**.** | ) | CASE NO.: 6:26-CV-237-CHB<br><br>JUDGE:<br><br>**<u>COMPLAINT</u>**<br><br>**(Jury Demand Endorsed Hereon)** |

Now comes Plaintiff Henry Foster, III ("Plaintiff"), individually and as Administrator of the Estate of Henry Foster, IV, Deceased, by and through undersigned counsel, and for his Complaint against Defendants, states as follows:

## I. INTRODUCTION

1. This action arises out of the tragic and senseless shooting death of Henry Foster, IV ("Decedent Foster") on August 18, 2025, outside of a Dollar General in Harold, Kentucky.

2. Decedent Foster lost his life at the hands of a Kentucky State Police Officer for experiencing a mental health crisis.

3. On behalf of Decedent Foster, Plaintiff seeks damages pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for the deprivation of Decedent Foster's clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution against Kentucky State Police Department ("the Department"), Defendant Corey Charles, ("Defendant Charles"), Defendant Nicholas Howell ("Defendant Howell"), Defendant Ricky Newsom ("Defendant

Newsom"), Defendant Jeremy Giles ("Defendant Giles"), and Defendant Bryan Austin ("Defendant Austin"), collectively known as ("Defendant Officers") individually and in their respective capacity as a Kentucky State Police Officer, for his respective violations of Decedent Foster's right to be free from the use of excessive force. Plaintiff also seeks the payment of attorney's fees per § 1988.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourth Amendment rights of Decedent Foster.

5. This Court has personal jurisdiction over the Department because it directs its activities at, and operates within, the geographical boundaries of the Commonwealth of Kentucky.

6. This Court has personal jurisdiction over Defendant Officers because, upon information and belief, Defendant Officers are Kentucky citizens that reside and work for the Department in this judicial district.

7. Venue is proper in this Court under 28 U.S.C. §1391, because all incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Kentucky and, upon information and belief, all Defendants reside in this judicial district.

## III. PARTIES

### A. Plaintiffs

8. At all times relevant to this action, Decedent Foster was a resident of Raven, Tazewell County, Virginia.

9. At all times relevant to this action, Plaintiff was, and is, a resident of the City of Jewell Ridge, Tazewell County, Virginia.

10. Plaintiff was appointed by the Tazewell County Probate Court on September 23, 2025, as the Administrator for the Estate of Decedent Foster. *See* Exhibit 1.

## B. Defendants

11. Defendant Charles is/was a citizen of Kentucky, is/was domiciled in Kentucky and is/was an employee within the KSP Department.

12. Defendant Howell is/was a citizen of Kentucky, is/was domiciled in Kentucky and is/was an employee within the KSP Department.

13. Defendant Newsom is/was a citizen of Kentucky, is/was domiciled in Kentucky and is/was an employee within the KSP Department.

## C. Supervisory Defendants

14. Defendant Jermey Giles is/was a citizen of Kentucky, is/was domiciled in Kentucky and is/was an employee within the KSP Department and acted as direct supervisor to Defendant Officers.

15. Defendant Bryan Austin is/was a citizen of Kentucky, is/was domiciled in Kentucky and is/was an employee within the KSP Department and acted as direct supervisor to Defendant Officers.

## D. The Department

16. The Kentucky State Police Department ("KSP") is the official statewide law enforcement agency for the Commonwealth of Kentucky.

17. KSP's mission statement promises: "The Kentucky State Police promotes public safety through service, integrity and professionalism utilizing partnerships to:

a. Prevent, reduce and deter crime and the fear of crime;

b. Enhance highway safety through education and enforcement and

c. Safeguard property and protect individual rights." [1]

[1] Team Kentucky Justice and Public Safety Cabinet, *Kentucky State Police*, justice.ky.gov (Aug. 11, 2026), Kentucky State Police - Kentucky Justice & Public Safety Cabinet

18. KSP's vision statement states, "The Kentucky State Police strive to maintain the highest standards of excellence utilizing training and technology to create a safe environment for citizens and to continue as a national leader in law enforcement." [2]

19. Defendant officers violated the Kentucky State Police Department Rules and Regulations, mission statement, and vision statement.

20. Redress is being sought from all Defendants in their official and individual capacities, and all Defendants were acting under and/or outside of color of law and/or pursuant to the policies, customs, and/or usages of the KSP Department.

## IV. STATEMENT OF FACTS

21. All preceding paragraphs are incorporated as if fully re-written herein.

22. On August 18, 2025, Decedent Foster was at was experiencing a mental breakdown and asking for a ride home from a Dollar General.

23. Around 7:30 a.m. a Dollar General employee calls 911 and reports Decedent Foster roaming the parking for a ride.

24. In response to the call, Defendant Howell arrives on scene with his gun drawn and sees Decedent Foster.

25. Defendant Howell approaches Decedent Foster, and he notices that Decedent Foster is pointing a small gun at his own head.

26. Defendant Howell does not recognize Decedent Foster and has not previously encountered him.

27. Decedent Foster tells Defendant Howell that he and his partner were in a car accident last night and that she is in the hospital.

---

[2] *Id.*

28. Shortly thereafter, Defendant Newsom, the negotiator, arrives on scene and sees Decedent Foster with a gun still pointed at his own head.

29. Defendant Newsom asks Decedent Foster "why are you upset and wanting to end your life?"

30. Defendant Newsom also asks Decedent Foster to drop the gun.

31. The Defendant Officers position themselves behind the police cruisers in the parking lot and create distances between themselves and Decedent Foster.

32. Decedent Foster tells Defendant Newsom that he wants to speak with his partner who is in the hospital.

33. Defendant Newsom moves closer to Decedent Foster and tells him that he will get him a phone to call his partner.

34. Defendant Howell exchanges his handgun for a rifle and keeps his position near his cruiser.

35. Meanwhile, Defendants radio Defendant Austin and inform him of the situation with Decedent Foster.

36. Defendants have access to less than lethal force options to safely arrest Defendant Foster.

37. But Defendant Austin does not instruct Defendant officers on how to secure the scene or how to use less than lethal force to apprehend Decedent Foster.

38. Eventually, Defendant Newsom tells Decedent Foster that his partner is going to call, and they are going to get him a phone.

39. Defendant Newsom puts his phone into a plastic bag, approaches Decedent Foster without his firearm and throws the bag to Decedent Foster.

40. Defendant Newsom says "Listen, we will get you the phone. Don't point that gun, don't point that gun at us."

41. Decedent Foster responds, "I promise I'm not going to."

42. Defendant Newsom repeats, "Don't point it at us" and bends down to get the bag and toss the phone to Decedent Foster.

43. Decedent Foster responds, "I told y'all, I'm not here to hurt y'all I promise."

44. During this exchange, Defendant Newsome does not have his gun drawn.

45. While Decedent Foster waits for the call from his partner, he is holding the phone in his right hand and holding his leg with his left hand.

46. Defendant Officers observe Decedent Foster experiencing a mental health crisis:

a. Decedent Foster expresses deep sadness and concern about his partner being in the hospital; and

b. Decedent Foster holds a gun to his own head.

47. About Fifteen minutes later, Defendant Charles, a Special Response Team Tropper arrives to the scene and instructs officers to block all traffic in both directions.

48. Defendant Charles walks towards the entrance of the Dollar General and stands behind a vehicle and sets up his gun on a tripod across the parking lot roughly ten yards to the left of Decedent Foster.

49. After Defendant Charles sets up his tripod, he speaks with Defendant Giles about the situation, including the positioning of other Defendant Officers.

50. Defendant Charles instructs the officers communicating with Decedent Foster to stagger themselves in a formation that allows the Special Response Team to see the interaction, however Defendant Charles ***does not*** speak with Defendant Newsom or Defendant Howell who have

been interacting with Mr. Foster for over an hour prior to Defendant Charles' arrival to the scene.

51. Defendant Charles radios "we have troopers about twenty-five yards; I'm to the left of them facing Dollar General store. [Decedent Foster] is going to be to the left side of the door, and he has a phone and the gun is ***down,*** but we don't know where it's at. I've got a good little sniper set up right now but if you can get to me [and] plus me up with a bolt gun a little further away or bring the HK gun to me then shift left then we'll have him with a good backstop."

52. Thereafter, Defendant Charles says, "I don't want him to touch it. If it's lying on the ground or something and he says that then tell him to stand up and walk to the other side of the [shopping cart] and he can sit back down. But if he has to pull it out, don't let him do that. I ain't going to let him pull it out that close to Ricky."

53. Decedent Foster does not pull his gun out.

54. Defendant Officers see that Decedent Foster cannot walk due to his broken legs.

55. Defendant Charles then loads his weapon and says, "this will kill him if we hit him with it."

56. Several minutes later, Defendant Charles then asks, "has he said anything about wanting us to kill him or he's going to kill himself?"

57. The officer responds that Decedent Foster does not want to hurry anyone, only himself to which Defendant Charles replies, "ok."

58. Another officer chimes in and informs Defendant Charles that Decedent Foster has not said anything about wanting Kentucky State Police to hurt him.

59. While waiting, another officer tells Defendant Charles they are "missing a couple of opportunities to storm him to draw him out."

60. At this point, Defendant Charles sees the gun in Decedent Foster's lap and informs

Defendant Officers of the gun placement.

61. Defendant Newsom says to the other Defendant Officers, "I'm just saying a bean bag round may not help."

62. Defendant Newsom is still within close proximity to Decedent Foster continuing to talk to him without his gun drawn.

63. Decedent Foster tells Defendant Newsom that he has a wrap for his leg in his jacket pocket that he needs to get out. To which Defendant Newsom responds, "do what you go to do."

64. Decedent Foster is still calmly sitting on the ground and holding the phone in his right hand when he asks Defendant Newsom, "why are they talking about how many rounds they have?"

65. Meanwhile, other Defendant officers acknowledge to one another that Decedent Foster has not pointed a gun at any officer during the interaction.

66. Decedent Foster remains sitting in the parking lot with the gun in his lap, the phone in his right hand, and his left arm is raised into the air.

67. As Decedent Foster lowers his left arm, Defendant Charles starts to move around chaotically, takes some big deep breaths, and then fires four shots at Decedent Foster, pauses briefly, and firing one additional shot at him.

68. Nobody else fires shots at Decedent Foster.

69. Decedent Foster cries out in pain and Defendant Charles says, "back up Rick. Hold. Troopers hold. Hold. Back up, Ricky. Get cover now. Cover. Come to me. I need two more. Somebody from the back. Two more. Keep coming to me. Hold, hold. Give me my helmet."

70. Decedent Foster falls onto his side and turns onto his back.

71. Defendant Charles then rushes towards Decedent Foster and says, "somebody take his hands. Stay there. Roll him over and cuff him. EMS this way."

72. Defendant Newsom backs up from Decedent Foster and another officer asks, "what made him [Defendant Charles] do that?"

73. Defendant Charles nor any other Defendant officers report that Decedent Foster picked up the gun, raised the gun, or aimed the gun at an officer or any other individual prior to Defendant Charles firing several shots at Decedent Foster.

74. Rather, at the time Defendant Charles shoots Decedent Foster:

a. Decedent Foster is not picking up the gun;
b. Decedent Foster is not pointing the gun at anyone; nor
c. Decedent Foster is not threatening to shoot anyone.

75. At all times relevant hereto, Defendant Officers observed:

a. Decedent Foster in mental distress;
b. Decedent Foster stating concern for his partner who was in the hospital;
c. Decedent Foster in need of medical attention for his leg(s); and
d. Decedent Foster sitting peacefully on the ground near the entrance of Dollar General.

76. At all times relevant hereto, while Defendant Officers are on scene, they do not observe:

a. Decedent Foster making any physical contact with anyone;
b. Decedent Foster threatening anyone other than himself;
c. Decedent Foster making violent gestures towards anyone;
d. Decedent Foster engaging in a verbal altercation with anyone;
e. Decedent Foster demonstrating any violent behavior towards anyone else; nor
f. Decedent Foster causing bodily injury to others.

77. Following the shooting Defendant Giles approaches Defendants Charles and Newsom and turns off their body worn cameras.

78. Despite Defendant Giles, a supervisor, being on scene none of the Defendant Officers reasonably attempt to create a controlled and safe environment to apprehend Decedent Foster without using lethal force and get him the medical attention needed.

79. Despite Defendant Giles being on scene, he does not direct the Defendant Officers how to create a controlled and safe environment to apprehend Decedent Foster, a mentally ill man, without the use of lethal force.

80. According to Gregory Nelson, medical certifier, died on August 18, 2025, as a result of multiple gunshot wounds of the torso and extremities.

## V. CLAIMS ALLEGED

## COUNT I

### 42 U.S.C. § 1983 – Excessive Force

81. All preceding paragraphs are incorporated as if fully re-written herein.

82. This claim is brought pursuant to Title 42 U.S.C. § 1983.

83. Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .."

84. The Fourth Amendment to the United States Constitution states, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . .."

85. For decades, the United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of an unarmed citizen. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 2 (1985). ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

86. While acting under color of state law, Defendant Charles deprived Decedent Foster of his well-established right to be free from excessive force, per the authority cited herein.

87. At all times relevant to this action, Plaintiff asserts that Decedent Foster had the clearly established constitutional right not to be subjected to excessive force while posing no threat of harm to the Defendants or others besides himself while experiencing a mental health crisis.

88. In other words, on August 18, 2025, Defendant Officers were only permitted to use the amount of force necessary under the circumstances to arrest and/or detain Decedent Foster.

89. Defendant Officers violated Decedent Foster's clearly established constitutional right not to be subjected to excessive force.

90. The Sixth Circuit has determined "it is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that they pose a threat of serious physical harm, either to the officer or to others." C*hrestman v. Metropolitan Gov't of Nashville and Davidson*, 156 F.4th 694 (6th Cir. 2025) (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)).

91. Defendant Charles did not have probable cause to believe Decedent Foster posed a threat of serious physical harm either to Defendant Charles or others, to wit:

a. Decedent Foster never raised a gun at Defendant Charles or others;

b. Decedent Foster never verbally threatened Defendant Charles or others; and

c. Defendant Officers were told by fellow officers that Decedent Foster did not intend to harm any KSP officers.

92. In *Heeter* the Sixth Circuit established that, "any officer would have known it violated the Constitution to shoot a suicidal individual that had moved slightly, even if the person held a gun in their pocket or could grab a gun within reach" and therefore an officer is not entitled to qualified immunity on the excessive force claim. *Heeter v. Bowers*, 99 F.4th 900, 915 (6th Cir. 2024).

93. Decedent Foster's gun was sitting on his lap at the time Defendant Charles made the decision to use lethal force thus taking Decedent Foster's life.

94. Decedent Foster, a suicidal individual, made a slight movement, but at no time wielded the gun at any officer.

95. At all times relevant to this matter, Defendant Charles was clothed with the authority of the state and misused that authority.

96. In this case, Defendant Officers used excessive force when they seized the person of Decedent Foster, to wit:

a. Defendant Charles intentionally fired his service weapon at Decedent Foster and killed him with gunfire while he posed no threat of death or serious bodily harm to him or others;

b. Defendant Charles intentionally fired his service weapon at Decedent Foster and killed him with gunfire while he experienced a mental health crisis and was in need of medical assistance;

c. Defendant Charles fired his service weapon while Decedent Foster made no verbal statements showing an intent to cause serious bodily harm or death to any person beside himself;

d. Defendant Officers failed to tactically secure the scene;

e. Defendant Officers failed to tactically address Decedent Foster to successfully deescalate the situation and provide aid to Decedent Foster; and

f. The taking of Decedent Foster's life was not necessary to get him the help/and or medical assistance he required.

97. Defendant Charles used force that was objectively unreasonable, to wit: When he shoots Decedent Foster, there is no moment when Decedent:

a. Raises his weapon;

b. Grabs his weapon;

c. Verbally threatens Defendant Charles or others;

d. Makes any threatening motion toward Defendant Charles or others; or

e. Makes any furtive movements.

98. Defendant Officers engaged in the above acts with a callous or reckless disregard for Decedent Foster's federally protected rights.

99. By reason of the foregoing, Defendant Officers used excessive force and killed Decedent Foster, thereby depriving Decedent Foster of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth (the right to be secure against unreasonable searches and seizures) and Fourteenth Amendments (each citizen has the right to life and liberty) of the United States Constitution to be free from gratuitous and excessive force. Defendant Officers' conduct manifested deliberate indifference to Decedent Foster's constitutional rights.

100. As a direct and proximate result of Defendant Officers' conduct, as set forth above,

Plaintiff has been damaged, including but not limited to: Decedent Foster was shot and lived with fear and conscious knowledge of his painful and immediately impending death prior to dying, Plaintiff's family was destroyed, and all have endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, emotional agony, loss of support, loss of companionship, loss of sense of personal safety, dignity, and legal fees and costs.

## COUNT II
**Supervisory Liability**
**(Against Supervisory Defendants)**

101. All preceding paragraphs are incorporated as if fully re-written herein.

102. This claim is brought pursuant to Title 42 U.S.C. § 1983.

103. At all times relevant herein, Defendant Giles and Defendant Austin ("Supervisory Defendants") are direct supervisors and form part of the chain of command for Defendant Officers.

104. The Supervisory Defendants have supervisory authority over Defendant Officers.

105. At all times relevant herein, Supervisory Defendants knew or reasonably should have known of, and/or participated in, and/or condoned, and/or ratified:

a. Defendant Charles shooting at Decedent Foster when he posed no risk of lethal harm to any officer or civilian, as stated herein above;

b. Defendant Charles shooting a man in a mental health crisis when Decedent made no threats nor violent gestures towards him or others;

c. Defendant Officers failing to de-escalate the scene, thereby making the scene more dangerous to Decedent, the officers, and the general public;

d. Defendant Officers failing to engage in reasonable tactical decision making to secure a mentally ill citizen; and

e. Defendant Charles' use of lethal force while facing no threat of lethal force.

106. The Supervisory Defendants knew or reasonably should have known that his acts and/or failures to act would likely cause the constitutional injury that befell Plaintiff and Decedent Foster, to wit: by endorsing, promoting, encouraging, and/or not disciplining Defendant officers, and/or by keeping them employed at the Kentucky State Police Department, and/or by allowing Defendant Charles to continue to use a firearm as a police officer and/or under the circumstances detailed in this Complaint, Decedent Foster was killed and Plaintiff lost his son, Decedent Foster, as a result of Defendants' reckless, wanton, and/or willful actions which were endorsed, condoned, and/or ratified by the Supervisory Defendants.

107. The Supervisory Defendants were active participants in the killing of Decedent, because they were on scene and/or advised Defendant Officers on how to engage Decedent, while ignoring Decedent's mental health needs and peaceful expression of not wanting to harm any officer.

108. The Supervisory Defendants had a duty and/or were required by his/their training to take action to discipline and/or otherwise prevent Defendant Officers from engaging in the above-stated conduct.

109. Despite his/their knowledge of Defendant Officers' misconduct, as stated above, the Supervisory Defendants took no action, failed to impose reasonable discipline, including recommending and achieving termination of employment, failed to follow chain of command, failed to document the instances of misconduct, and/or otherwise abandoned his supervisory duties.

110. As a result of their failures and/or abandonment of his supervisory duties, as stated above, the Supervisory Defendants created an environment that condoned the aforementioned misconduct and perpetuated and/or facilitated and/or aided Defendant Officers in their unreasonably violent and grotesque seizure of Decedent Foster's person and the taking of his life when he posed

no lethal threat to Defendant Charles or anyone else at the time he was killed.

111. The Supervisory Defendants engaged in acts and omissions that were the product of a reckless or callous indifference to Decedent Foster's constitutional rights, to wit:

a. The Supervisory Defendants trained, endorsed, condoned, and/or conducted Defendant Charles to shoot at subjects in the manner detailed above, i.e., when the subject posed no direct threat to them or others, and is actively experiencing a mental health crisis;

b. The Supervisory Defendants condoned Defendant Charles' shooting of Decedent, despite Defendants having no reason to use lethal force;

c. The Supervisory Defendants trained, endorsed, and/or participated in Defendant Officers failing to tactically secure a scene or use less than lethal force with a citizen having a mental health crisis and needing medical attention;

d. The Supervisory Defendants trained, endorsed, condoned, and/or conducted Defendant Officers failing to tactically address Decedent Foster to successfully deescalate the situation and provide aid to Decedent Foster; and

e. Despite having the aforesaid knowledge, the Supervisory Defendants continue to condone, ratify, and/or approve of the conduct and actions of Defendant Officers and/or continue to employ him as stated above.

112. By their acts and omissions as stated above, Defendant Officers and the Supervisory Defendants in fact caused Plaintiff's constitutional deprivation: to wit, Mr. Foster was seized/killed with lethal force while unarmed in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

113. As a direct and proximate result of the Supervisory Defendants' conduct, as set forth

above, Plaintiff has been damaged, including but not limited to: Decedent Foster was shot and lived with fear and conscious knowledge of his painful and immediately impending death prior to dying, Plaintiff's family was destroyed, and all have endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, emotional agony, loss of support, loss of companionship, loss of sense of personal safety, dignity, legal fees and costs.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants, jointly and severally, for not less than $5,000,000.00, including but not limited to:

A. Compensatory and consequential damages in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

B. Punitive damages in an amount to be determined at trial, for the willful, reckless, and malicious conduct of Defendants;

C. Equitable relief, including that Kentucky State Police Department be made to adopt an appropriate policy to prevent future instances of the type of misconduct described herein;

D. Attorneys' fees and all costs associated with this action; and

E. Any and all other relief that this Court deems equitable, just and proper.

## VII. JURY DEMAND

Plaintiff respectfully demands a trial by jury of the within matter.

Respectfully submitted,

*/s/ Matthew L. Bunnell*

Matthew L. Bunnell (#99005)
Benjamin F. Hachten
**ALIGNED LAW, PLLC**
7410 New LaGrange Road, Suite 315
Louisville, Kentucky 40222
Tel.: (502) 576-9933

ben@aligned-law.com
matthew@aligned-law.com
***Counsel for Plaintiff***

*/s/ Kenneth P. Abbarno*
Kenneth P. Abbarno *
Robert F. DiCello *
Justin J. Hawal *
Peter C. Soldato *
Joseph T. Frate *
Jordyn A. Parks *
**DICELLO LEVITT LLP**
8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
Tel.: 440-953-8888
kabbarno@dicellolevitt.com
rfdicello @dicellolevitt.com
jhawal@dicellolevitt.com
psoldato@dicellolevitt.com
jfrate@dicellolevitt.com
jparks@dicellolevitt.com
***Counsel for Plaintiff***

**Pro Hac Vice* admission forthcoming